**LAWSON v. UNITED STATES et al.**
**RETZ v. AMERICAN PETROLEUM TRANSPORT CORPORATION et al.**

United States District Court
S. D. New York.

Feb. 16, 1950.

Gay & Behrens, New York City, for libellants, Edward J. Behrens, New York City, of counsel.

Irving H. Saypol, United States Attorney, New York City, for respondent, United States, Howard F. Fanning, Special Assistant to the United States Attorney, New York City, of counsel.

**IRVING R. KAUFMAN, District Judge.**

These suits are brought under the Death on the High Seas Act, 46 U.S.C.A. § 761–768, by the personal representatives of Antonio Scull Cardenas and Donald Retz, two members of the crew of the steamship Crow Wing who lost their lives on March 30, 1945, when that vessel collided with another on the high seas.

After a trial before the Hon. Alfred V. Bryan, it was adjudged by the court that the deaths of the two seamen were caused by the negligence of employees of the defendant United States of America. After the fault was found the matter was referred to a Commissioner:

(a) To ascertain and compute the fair and just compensation for the pecuniary loss sustained by each of the persons for whose benefit these suits have been brought;

(b) To apportion among such persons the amount of damages in proportion to the loss they severally suffered by reason of the death of the persons by whose representatives these suits have been brought;

(c) To ascertain the amount received in pursuance of the Second Seaman's War Risk Policies of insurance, by each of the persons for whose benefit these suits have been brought, and to deduct such amounts from the separate recovery of each beneficiary who shall have thus received part of the proceeds of such policies;

(d) To report to the Court with all convenient speed.

The Court has before it exceptions filed by the libellants to the report of the Commissioner which question his conclusion concerning the status of one Antonia Martinez as a beneficiary, and the adequacy of the amounts awarded to other beneficiaries.

The status of Antonia Martinez as a beneficiary of the deceased Antonio Scull Cardenas will be considered first.

On June 9, 1943 Cardenas married Paula Liendo in New Orleans. (Note: Maiden names will be used in reference to the Cardenas suit). On July 27, 1943, he signed on a steamship as an ordinary seaman and executed a form of beneficiary designation naming Paula Liendo as his wife. Cardenas left Paula Liendo after they had lived together for about seven weeks, and she did not hear from him again. They were never divorced.

Antonia Martinez met the deceased about Christmas of 1944. On March 9, 1945, Cardenas executed an affidavit in the Borough of Manhattan of the City of New York for the purpose of procuring a license to marry Antonia Martinez in which he swore that he had not previously been married. The two were married in a church in New York City the next day. Cardenas joined the steamship Crow Wing March 20, 1945 and lost his life ten days

later. He was 25 years old at the time of his death and was a citizen of Cuba.

The Commissioner found that Paula Liendo was the lawful widow of the deceased and the libellants do not challenge that finding. They do maintain, however, that Antonia Martinez has some rights under the Death on the High Seas Act, in that she was a "wife" or "dependent relative" of the deceased under that Act.

The Death on the High Seas Act provides as follows:

"Section 1. Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative, against the vessel, person, or corporation which would have been liable if death had not ensued." 46 U.S.C.A. § 761.

"Section 2. The recovery in such suit shall be a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought and shall be apportioned among them by the court in proportion to the loss they may severally have suffered by reason of the death of the person by whose representative the suit is brought." 46 U.S.C.A. § 762.

The question presented is whether a putative wife, i. e., one who goes through a marriage ceremony but is not legally married because of an impediment existing on the part of the man which was unknown to the woman at the time of marriage, has any rights under the Act.

■ The Court of Appeals for this Circuit has held that in interpreting the Act federal law and not state law is applicable. Middleton v. Luckenbach S. S. Co., 2 Cir., 1934, 70 F.2d 326, 327. The Death on the High Seas Act does not establish classes of beneficiaries, but rather permits any one falling within the category of "wife, husband, parent, child, or dependent relative" to recover without regard to the existence of other beneficiaries. The amount of recovery is determined by the actual pecuniary loss sustained by the beneficiary due to the wrongful death. From the purpose of the Act, the breadth of the language used in the Act, and the absence of classes of beneficiaries, it would appear that Congress desired to compensate those who actually lose substantial rights of support by reason of a wrongful death to the greatest extent permissible under the provisions of the Act.

■ There is almost a complete dearth of legal precedent on the problem herein raised. The Court could summarily dispose of the question by stating, as have some courts under similar acts, that a putative wife "is not included in the terms 'widow' and 'wife,' which necessarily imply a lawful marriage." Beebe v. Moormack Gulf Lines, 5 Cir., 1932, 59 F.2d 319, 320. However, this Court does not believe that deciding the case in such a manner meets the problem involved, nor does it do substantial justice.

The Death on the High Seas Act uses the terms "wife" and "dependent relative". The Court does not believe that Antonia Martinez properly comes within the class of "dependent relative". Is she, however, a "wife"? The Act does not define the requirements that constitute one a "wife".

Antonia Martinez went through a religious ceremonial marriage with the deceased. She saw a bona fide marriage license procured by the fraudulent statement of the deceased. She had not previously been married nor, as far as she knew, had the deceased. The two lived together as man and wife. Cardenas paid the rent and gave Antonia Martinez $50 before he sailed; on the shipping articles he named her as his next of kin and made an allotment of $100 a month to her. Now this Court is asked to find that Antonia Martinez was not the "wife" of the deceased under this statute. This the Court cannot do. Where a marriage is void because of some legal impediment, modern enlightened jurisprudence will not in all instances take the position that the mar-

riage never occurred. Indeed there are purposes for which the marriage must and will be recognized, and the social conscience dictates that the instant case is one which falls in that category. Antonia Martinez was dependent upon the deceased for support, and had she brought suit in the New York courts for an annulment of the marriage, she could have obtained an order for support pursuant to Section 1140-a of the New York Civil Practice Act. The Death on the High Seas Act was intended to compensate those who lost the financial support of the deceased—Antonia Martinez did have a right to support. The Act also intended to cover a "wife"—Antonia Martinez was a wife in fact, if not entirely in law.

It should be noted that the law of New York, though not determinative of the interpretation of the word "wife", does refer to the spouses in a void marriage as "husband" and "wife". Sec. 1140-a, N.Y. C.P.A. Even in the cases cited by the respondents, the woman was designated as a "putative wife", and she had certain civil and property rights. See Beebe v. Moormack Gulf Lines, supra; United States v. Robinson, 5 Cir., 1930, 40 F.2d 14.

If the Court had any doubt as to the status of Antonia Martinez, it was resolved by the unanimous decision of the Court of Appeals of this Circuit in the Middleton case, supra. This case is the only discoverable case under the Death on the High Seas Act which is pertinent to the questions herein involved, and deals with the general scope of the Act. The exact problems before the Court in that case were

(a) whether an illegitimate child could recover for the death of its mother,

(b) whether a mother of an illegitimate child could recover damages for its death, and

(c) whether an illegitimate child could recover damages for the death of its father.

The Court allowed all to recover, holding that they were "parent" and "child" within the language of the Act.

In construing the coverage of the Act, the Court said, 70 F.2d at page 329: "There is no right of inheritance involved here. It is a statute that confers recovery upon dependents, not for the benefit of an estate, but for those who by our standards are legally or morally entitled to support. Humane considerations and the realization that children are such no matter what their origin alone might compel us to the construction that, under present day conditions, our social attitude warrants a construction different from that of the early English view. The purpose and object of the statute is to continue the support of dependents after a casualty. To hold that these children or the parents do not come within the terms of the act would be to defeat the purposes of the act. The benefit conferred beyond being for such beneficiaries is for society's welfare in making provision for the support of those who might otherwise become dependent."

Note that the Court stated that the Act "confers recovery upon dependents, not for the benefit of an estate, but for those who by our standards are legally or morally entitled to support." Not only was Antonia Martinez legally entitled to support, but unquestionably she was morally entitled to the support of the decedent. In innocence and in ignorance of the previous marital situation this woman in a church ceremony accepted Cardenas as her husband. The marriage was consummated. He supported her as his wife, made an allotment to her;—it was she who received the notice of his death and the few reminders of his existence. By no moral standard could it be said that she was not entitled to support.

As the Court of Appeals said, the purpose of the Act was to continue the support of dependents after a casualty, the benefit conferred being for society's benefit, as well as the beneficiary, in making provision for those who might otherwise become dependent. Antonia Martinez falls within that purpose for it is claimed that she is now a recipient of public relief from the City of New York.

The respondent argues that there is no reason why it should be penalized because the deceased was a bigamist. The respondent is not being penalized since the Act contemplates multiple beneficiaries, and these beneficiaries cannot receive more

than the seaman's ability to contribute to their aggregate support. The question primarily involved here is not the liability of the respondents, but rather the method of division of the "just compensation for the pecuniary loss sustained" by the persons who have suffered by reason of the wrongful death. While it may be argued that there would be no great injustice if Antonia Martinez were denied relief since she and the decedent lived together as man and wife for less than two weeks, it is the opinion of this Court that the time element is irrelevant, since the principle established in this case would have to be applied in a situation where the deceased had lived with a second wife for many decades, she being in ignorance of a legal impediment to the validity of their marriage.

It is, therefore, the decision of this Court that Antonia Martinez is entitled to relief as a wife of the decedent under the Death on the High Seas Act.

The libellant's exceptions attack the award to Paula Liendo on the ground that it is inadequate in amount. The Commissioner granted her an award of $6,000 against which he credited the amount of $4,000 paid her under Cardenas' Seamen's War Risk Insurance policy, making a net award of $2,000.

■ Cardenas did not contribute to the support of Paula Liendo except to pay the rent of the apartment in which they lived together for seven weeks. After the deceased left New Orleans, Paula Liendo did not hear from him, did not know his address, and he did not send her any money or make an allotment to her. It is clear from the evidence that the decedent had deserted her, that he was a person of low earning capacity, and had no regard for his responsibilities to her. She did not depend on the deceased for support after he deserted her. On the basis of this evidence it cannot be said that the award of the Commissioner was unjustified and inadequate.

■ The libellants also claim that the awards to the father and stepmother of Donald Retz were inadequate. The Commissioner found that the father was en-titled to an award of $5,000 against which was credited $2,500 paid under the Seamen's War Risk Insurance Policy, making a net award to him of $2,500. The Commissioner also found that the deceased's stepmother was entitled to an award of $2,500 against which was credited $2,500 paid her under the Second Seamen's War Risk Policy, thereby granting her a merely technical award.

Donald Retz was 19 when killed aboard the Crow Wing. He had graduated from high school when he was 17 and had worked for the Gray Hub Company in Detroit and earned approximately $45 per week for about two months before joining the Merchant Marine. He obtained seaman's papers in September 1943, and served on four vessels as a messman and ordinary seaman before joining the Crow Wing as an able-bodied seaman.

The deceased's stepmother was 65 when he died and has been suffering from diabetes and a disease of the heart. The deceased made allotments of $25 two or three times to her, which allotments were placed in a joint account. Mrs. Retz drew nothing from that account for her own use but rather indicated that the account was a savings account for Donald Retz' use only. The only other evidence of a contribution from the deceased to his stepmother was that relating to a gift of about $200 when the deceased was at his home in February, 1945.

The deceased's father was 57 years old when the deceased was lost. He is a gauge tool grinder and tool maker and has been steadily employed from about 1932 on. His average yearly earnings from 1942 through 1948 were about $5,000. He earned about $4,500 in 1948 and expected to earn about $4,000 in 1949. He owned his own home and an automobile and was apparently in good health up to the time he testified in May of 1949. He had no financial dealings with his son and was not dependent upon him for support. The libellants claim that Mr. Retz' financial condition has gradually become worse and that it would be reasonable to assume that, had Donald Retz continued to live, he would have contributed to the support of his mother and father.

This is undoubtedly true, and the Commissioner must have taken this into consideration, for otherwise an award of $7,500 to a father now 61, in good health and with a better than average earning capacity, and a stepmother now 69, and unfortunately in poor health, would be excessive, especially in view of the meager contributions made to them by Donald Retz prior to his death. Furthermore the deceased had four brothers, all of whom had either married or for other reasons left the household before the deceased joined the Merchant Marine, and it is reasonable to assume that they would assume part of any obligation to support their parents if such support were needed. Therefore, it cannot be said that the awards to Mr. and Mrs. Retz were inadequate. Cf. Middleton Steamship Co. v. Luckenbach, supra.

The report of the Commissioner is affirmed as to the awards to Paula Liendo, Mary Retz and Frederick Retz. The exceptions to the findings of the Commissioner as to the status of Antonia Martinez are sustained and the cause is remanded to the Commissioner for further findings as to an additional award to Antonia Martinez in conformity with this opinion.